This is a video presentation of the ITC website, www.itc.ca. The commission specifically pointed to the fact that they found that it was not clear from the prior art, or not known in the prior art, how an auxiliary component adapted to modularly attach to the elongated body input device, where the elongated body includes the first arrangement of motion sensors that detect the first motion, and where the auxiliary component has a second arrangement of motion sensors that detect the second motion. In other words, there's activity that is actually in the claims, and so it's more than just saying we can have more than one sensor, or we can even have two sets of sensors operating at the same time. It's how they work together. Your Honor, first of all, the commission there was quoting from the Patent Office reasons for allowance, and the Patent Office was basically stating that one of the reasons for allowance, and I would submit the most important reason for allowance, was the modular feature. How do we know that? Because the prior art already had motion-sensitive devices. It had devices like Goshi that had multiple motion sensors that could sense motion in multiple directions. Goshi taught three or more accelerometers, each one of which is a motion sensor. So the prior art already taught motion sensors, multiple motion sensors, working together to detect multiple motions, so that can't be the point of novelty of the claim. What was novel in the claim was this idea of modularly connecting, or modularly building a controller where you could add additional motion-sensing capability. That doesn't apply to the 917 patent, right? That does not. You're absolutely correct, Your Honor. I'm trying to focus my arguments today on 742. It seems to me that there's a considerable difference in the strength of your argument with respect to the two patents. That's why you're focusing on the two, I think. I would not disagree, Your Honor. So going back to the 742 patent, another way we know that the concept of modularity was important and novel was that Nintendo itself, 18 months after we filed our patent application, they filed their own patent application for a modular motion-sensitive controller. And by the way, that application listed five of their top engineers, including the head of their R&D division. And they told the patent office at that time, 18 months after our patent was filed, that the concept of a modular motion-sensitive controller was in a significant advancement in the art of video game controllers. And it's also worth noting that Nintendo, throughout this investigation, was not able to come up with a single anticipation reference against Claim 24, not a single one. And it wasn't for a lack of motion-sensing references in the art. The art is replete with motion-sensing references, and they asserted many of those references against us, including, but not limited to, Sado, Goshi, Holt, Nitta, Glynn, Lapston, and many, many others, plus the work of Dr. Nakra. What Nintendo was unable to find in the art throughout this entire investigation was the concept of a modular motion-sensitive controller, the concept that they themselves thought was so novel that they filed their own patent application on it in 2005. And so this case is not like, for instance, automotive technologies, where the point of novelty is the very thing that we're trying to enable by going to the prior art. This is a combination claim with many, many, many limitations, just one of which is the motion-sensor limitation. We disclosed an enabling embodiment of that motion-sensor limitation, it happened to use tilt sensors, and we explained that, the inventors explained that a person of ordinary skill in the art would know how to use other motion-sensors, which was absolutely true. And so with that, we submit that the Commission erred in finding the claim invalid for lack of enablement. I'd like to move on to the Commission's domestic industry ruling, if I may. And this is an important issue that's going to have implications for all complainants in the ITC. The Commission's ruling is based on the notion that the interactive play environment of the Magic Quest game, which is the commercial embodiment we relied upon, is, quote, far removed from the technology protected by the patent. That's a quote from the Commission's decision at page A67. But claim one of the 742 patent, which is our domestic industry claim, specifically recites an interactive play environment, actually recites it twice, once in the preamble and once in the body of the claim, where it makes clear that the claim to one has to be configured to work with an interactive play environment. Now, the Commission said those are just statements of intended use. I disagree that at least the statement in the body of the claim is a statement of intended use. It's a positive claim limitation that has to be satisfied in order for the claim to be satisfied. But regardless, even if those are mere statements of intended use, as the Commission said, they are highly relevant to the domestic industry inquiry. It seems that the Commission tried to give you a chance to satisfy this, and asked for more information, more detail, sent it back for additional inquiry, and yet ultimately the Commission felt it was just a failure of proof on your part. Your Honor, I would disagree with that. That's not exactly what happened. We presented our evidence at the hearing. The evidence consisted of our witnesses, the spreadsheets of all the financial information. Nintendo didn't cross-examine any of our witnesses, neither did the Commission. All that evidence just came in. It wasn't until eight months later or nine months later when we got the initial determination, and by the way, the staff, the OUII, supported our position, and so everything looked like it was not going to be a disputed issue. Nobody was even cross-examining our witnesses on this issue. We get to the initial determination, and suddenly the ALJ says there's no domestic industry. It was a complete and utter surprise, because even the OUII, the staff, said there was a surprise to us, it was a surprise to the staff. At that point, the record closed. We couldn't put in new evidence. Nobody asked us for new evidence. The spreadsheets say what they say. Our witnesses said what they said, and by the way, there was absolutely no dispute. I think there was some mud in the record about this, but there's no dispute that all of our expenses and all of our investments, except for the wand, were made in the United States. It was really just a question of granularity. Did we provide a finely granulated enough spreadsheet? But there's no question that all of the expenses, and so for instance, I would point to page A1362, which is the testimony of Mr. Snyder, and he was asked about the components of MagicQuest, and he explained that MagicQuest includes an infrastructure portion and a wand, and the infrastructure portion includes the physical space, the MagicQuest effects, the back-end computer equipment, the software, and all the wiring and other infrastructure to make the system operate. So that includes the effects and the circuit boards and the software and the wiring, everything, with the exception of the wand. And then he said the wand, if you go to question 159, they ask, where are the components of MagicQuest manufactured? And he says the infrastructure portion of the game, which is all of that stuff I just mentioned, is manufactured entirely in the United States, either in our fabrication facility in Oregon, or our on-site, or our previous location in Florida, or the on-site location at the MagicQuest facility, which is in South Carolina. So there's no question that all of those millions and millions of dollars that we invested to build that game, including the back-end software, including the circuitry inside those effects, was built in the United States. So yes, there's a question of whether we partitioned out or had a finely enough granulated spreadsheet, but there's no question that all of those expenses were paid in the United States. Now, what I think this comes down to... Let's hear from the other side. We'll save you rebuttal time. Thank you. You've exhausted your time. The rising slide. Thank you. May it please the Court. If I may, I'd like to spend a minute or two on written description and then switch over to domestic industry since I have limited time. Counsel for the appellant characterized this case as falling within the spectrophysics line of cases. The Commission submits that there aren't two separate lines of cases. There's the corpus of this Court's case law concerning Section 112. There are some cases that say that it's okay to omit what's well-known in the art, that you don't want to include production details. If that's true, it's quite curious then that the patents in suit have production details for what was actually known to these inventors as far as the parts that were going to be procured and really in fine-grained detail. There's no dispute that the inventors here did not know how to practice the full range of the invention. I think it can be agreed that all that the inventors were trying to do was to stake positions beyond what they had actually invented. I would just also like to add on written description that there appear to be claims in the 742 patent that do not seem to have these Section 112 problems. Independent claims 14 and 50 in the 742 patent cover tilt sensors with on-off states or active-inactive states, which certainly more closely correspond to the actual invention here. With respect to domestic industry, the Commission reasonably construed the statutory language that the domestic industry must exist with respect to the protected articles. The protected articles here are the Toy and Wand, and this is discussed at the Commission opinion at pages A61, A63, and A72. In trying to indulge or entertain Creative Kingdom's arguments, parts of the opinion may be a little bit less clear with the benefit of a year of hindsight. I would call the statute being so specific as to the article. It is quite specific that there must be a domestic industry. Well, it says that there must be a domestic industry. Is that a distinction that's critical to your view? Well, the distinction is that with respect to the articles, it has to be the articles themselves, the Toy Wands, and as the Commission found, certain limited other expenditures could also be associated or attributed to being with respect to the articles. How would you characterize, give me the best characterization you can give of the scope of the certain other articles that are related to the patented protected article? Well, the way that the Commission described it here, I think, is the fairest way, is that the domestic expenditure on what was central to enabling the Toy Wands would also count. Central to enabling, is that? Central to enabling. Central to enabling. Central to enabling. So given that the Toy Wands output signals in a particular format, the Commission was willing to consider the receivers that received those signals as well, but not the entire play area, which contains a lot of very elaborate designs. But if, as a practical matter, let's assume as a practical matter, this wand would have no commercial value, absent the elaborate play setting in which it is employed, as it is employed in this country. Why not regard that elaborate play context as being essential or central to the functioning of the wand, as an economic matter? Well, as an economic matter, I mean, perhaps it could be, but as a statutory matter with respect to the Articles, and the previous subsection of Section 337 is, I think, relating to the Articles, the statute requires a connection with the Articles. In most cases, it's expenditure on the Article directly that is sufficient. Let me give you a hypothetical. What if General Motors owns a patent on windshield wipers, but it has those windshield wipers manufactured somewhere else, and they just get shipped in, and then they're stuck on a car, and they're fully contained, all they have to do is be put on the car. Does it mean that General Motors doesn't have a domestic industry, because it spends so much, it spends such a little amount of money to attach them to the car? Well, it depends on what the nature of the Article is, and the Commission has dealt with this in the sloppy disk drives cases and other cases involving components. We could look, for instance, at whether the wiper blades are sold in the marketplace discreetly, including in aftermarket uses. It depends. I thought I heard you tell us it doesn't depend on a particular context in Article. Well, what I was trying to say is that we're focused on the statute, and it seems that there are two separate questions here. The first is going to be defining what the appropriate Article is, and the Commission here defined the Article as a toy wand. The secondary question, and admittedly, these two inquiries are a little bit clouded in the Commission's opinion, and I hope to help. The second inquiry is whether expenditures that are not discreetly in that toy wand are nonetheless with respect to it, and the Commission was willing to credit a good bit, but not the entirety of this play area with its castle, with its turrets, and its treasure chests. Let's assume that the castle and the turrets and the play area would never be there but for the wand, that the wand is the central feature, the central attraction, but similarly, that the wand by itself would not be economically viable absent a setting such as that. Why not include those features as related to our, what's the statutory language, with respect to the Article? Well, I mean, that's certainly a question that could be posed to Congress, and with... Well, but why isn't it something that is reasonably within the scope of, say, some of the Commission's own opinions? Well, the Commission has never gone that far. The only case in which an argument nearly as aggressive as this was presented was the set-top boxes case, where Verizon argued... That's the Verizon case? Yes, that's the Verizon case, where Verizon argued that the entire build-out of its FIOS network should be attributed to its set-top boxes, and the Commission did not affirm the ALJ's decision. They chose to take no position and focused instead on the simpler argument for appeal. Verizon had a fallback argument as to its repair of the actual boxes and those domestic activities. We didn't have a fallback argument from CK here. And with my remaining minute, I'd just like to note that the Commission's decision here can be affirmed based on any one of the four bases for no violation, domestic industry, written description, enablement, and non-infringement, and should the Court do so based on this Court's case law, the Court needn't reach the other issues. Thank you. Thank you. We will hear from Mr. Smith. May it please the Court? Just echoing briefly what Mr. Rosenzweig said, there are four independent bases to support the IPC's decision, each one of which is supported by substantial evidence, and that's the standard before Your Honors today. And we believe each individual basis is supported by substantial evidence and any one of which would support the decision of the IPC that there's no finding of violation under Section 337. With that, I want to briefly just focus on the written description issues and really the Section 112 lack of adequate disclosure in the specification for the 714. I think it's more of a written description problem than an enablement problem. Both. Your Honor, both. How would you piece apart the two? I know sometimes they overlap considerably. How would you piece apart the two as applied to this case? And which of them do you think is the more powerful doctrine in your favor? Your Honor, let me answer the last part of that question first. I think given the factual nature of this case and the posture of this case with substantial evidence, I think the enablement may be the stronger because the credibility determinations and the factual, if there's factual distinctions or there is any conflict, then the tie goes to the IPC. But I think they're very strong doctrines. And how I would tease that out to answer the first part of your question, this Court has been very clear, particularly in Ariadne, in a number of different cases, the hallmark of possession for written description is disclosure within the four corners of the specification. And this Court has been clear in terms of written description and enablement. You just can't rely upon the prior art to say this is my enabling disclosure or this is my… You must rely in part. You can't incorporate 20 volumes of physics text into your specification. Sure, Your Honor. Let's not overstate what needs to be in the specification. Yes, Your Honor. Absolutely. You don't have to put… I think this Court has clarified. You don't have to put minor details that are well known in the art into the specification, for example. Let me use an absurd example, how to use a hammer, for instance. But in this case, this goes to the heart of the issue. It is we had a disclosure here that in the specification that talked about mechanical ball switches. We had detailed figures. We had detailed explanation. And in contrast, we had a laundry list of electronic sensors within which there was two accelerometers and gyroscopes within a number of other sensors that their own expert didn't even know what those other electronic sensors were doing. That's cited in the ITC opinion in pages 44 and 45. Your expert seemed to think that they were all common knowledge. Dr. Polish. Is it Polish or Polish? It's Dr. Polish. Your Honor, two points there. Number one, he talked generally about accelerometers and gyroscopes in the art. And number two, he also specifically detailed, and I think it was 50 or 60 pages of written testimony, about why it would be undue experimentation to simply put in the accelerometers or the gyroscopes in this mechanical ball switch device, and also why he had thought the inventors weren't in possession. And we know for a fact, Your Honor, that these inventors were not in possession. They asked you to disregard their testimony for written description. But we know they were, in fact, not in possession of the claims with the electronic sensors and accelerometers and gyroscopes. And this is an important point because, as the ITC found in their decision that's supported by substantial evidence, that in the patent with the mechanical ball switches, if I have a wand, the patent was for a magic wand. And then I did the right spell. There's two balls, one in the tip, one down a little bit below, wired in series. If I do the right motion, one ball goes up, one goes down and closes the circuit. It's an on-off switch. By contrast, what did the ITC, what was the substantial evidence in front of them? It was not only the specification, not only undisputed that the inventors didn't have possession of this invention or know how to enable the electronic switches, they also had in front of them Mr. Holt, they had Dr. Knopfler, Dr. Polish, and what did they say? Mr. Holt said it took them six months just to take one accelerometer to put it in a wand that he was building for his nine-year-old daughter, a conjure wand. And why was it so difficult? Because this concept of off-on doesn't apply to the accelerometers. The accelerometer measures... The accelerometer, their claim is directed to the broader concept and to select a specific detailed manipulation. It might have taken him nine months. It might take me 90 years to do it. But if, in fact, it is a method, if there is a method of carrying it out after the patent application is filed, what's your answer to Mr. Barney's position that having stated the function sufficiently so that it can be performed, that that suffices? I disagree with him from a legal perspective and the factual basis, Your Honor. The legal perspective is on enablement, it's undue experimentation. And that was the evidence, the substantial evidence that the IPC heard from Mr. Holt, from Dr. Knopfler. It had to do with using an accelerometer, but perhaps using, as a matter of fact, a gyroscope technology was perhaps more advanced. There was no testimony, Your Honor, in that regard. If anything, I think Dr. Polish said... If it was in the prior act, perhaps he didn't need testimony in that regard. And your witness agreed it was in the prior act. Well, Your Honor, I want to make perfectly clear what our witness, Dr. Polish, said. Two different pieces here. First, what he said was that gyroscopes and accelerometers were no, in the art. That's what he said. He didn't say that these specific, and I think this is an important point, these specific sensors in the base, and they each have to react to a different motion, and the base has to also be configured to do particular motions, waving, stroking, so forth and so on. His point was, he never said that those points were in the art. The broadest claim isn't that limited. The broadest claim is limited to a modular attachment. Yes, but not to the details you've just recited. Well, the claim itself talks about particular motions, Your Honor, moving, shaking, twisting, stroking, and it talks about two configurations of sensors, one in the base and one in the modular portion, the auxiliary portion, and that they have to attach. Yes. Yes. And it's very important, Your Honor, that down below, and I think this is a critical point, down below, they argued that these motion sensor limitations in the claim 24 were not obvious. And this is at A12027. For example, Dr. Vocek said that Gauchy, and we've heard about Gauchy from Mr. Barney, Gauchy did not meet the auxiliary component limitation that included the motion sensors. So now they're pivoting and embracing the prior art on appeal because obviousness is no longer in the case. We lost that down below. But the critical point was there was these specific configurations of motion sensors in the claim was not found by the commission to be obvious. They've never embraced these particular limitations as being in the prior art and being enabling. For example, Dr. Vocek never said, well, Gauchy and Sato are my enabling disclosures. They're the ones that one skill in the art would look at, and knowing that art would be able to sit there and practice this claim without undue experimentation. He never said that. Dr. Polish, our expert, testified in detail about what would be important to do and how difficult it would be to do it for undue experimentation. The commission looked at Dr., excuse me, Mr. Holt, who was a prior art inventor, looked at Dr. Nakra. And so here we are, your honors, in the context of having, is there substantial evidence to support the ITC's decision? Chief Judge Bullock heard from the inventors. He heard from the experts. He heard from Mr. Holt. He heard from Dr. Nakra. And given that whole composite, sure, is there evidence that may support their point of view? Sure, but that's not the standard for review before your honors. Okay. Thank you, Mr. Smith. Thank you. Brian, you have your rebuttal. I may not need the full time. I just have a couple points, your honors. The first is on domestic industry. Judge Bryson, I think you hit the nail on the head. None of these investments would have been made but for the wand. The Magic Quest attraction only operates with the wand. There was something in one of the briefs that said it was an amusement park with rides and food stands. That's not true. It's absolutely not true. Weren't there some Magic Quest sites that didn't use the wand? No, your honor. First of all, the Magic Quest site that we relied on primarily was the one that's owned and operated by Creative Kingdoms. That's the one that is the bulk of the testimony. There are 15 other licensed Magic Quest attractions in the United States and two additional ones in Japan and I think there's one in Canada. We didn't rely on those specifically for the investments. We did point out that our largest licensee, Great Wolf Resorts, has invested quite heavily, many millions of dollars in building out their Magic Quest facilities. We're content to rely on just the wholly owned and operated Magic Quest attraction in Myrtle Beach for our domestic industry because I think the investments there are substantial. The entire facility, the only thing you do there is play Magic Quest. If we didn't have the wand, that facility never would have been built, none of those investments would have been made, none of the people who were employed there would have jobs. This is a classic domestic industry, an American industry built around the patents and technology. I wanted to point out that the statute, and again you alluded to it, but the statute says with respect to. That doesn't mean it has to be the patents and technology. In this case, this court last year in InterDigital interpreted with respect to to mean related to. Certainly, the Magic Quest attraction is related to the patented wand because it wouldn't exist but for the wand and that's an undisputed fact. In fact, it's even in a footnote in the commission's decision. Very quickly, how much of what the commission did is factual and how much is legal in your view on this issue? It's a difficult question to answer. It had a gloss of factual but a lot of the facts that are recited I believe are not correct when they say, well, there wasn't evidence of this, there wasn't evidence of that. Let me ask the question this way maybe to get what I'm concerned about. What is the core legal error that the commission committed? The core legal error is a misinterpretation of the domestic industry statute, specifically the phrase with respect to. There seems to be honestly an arbitrary and capricious interpretation of that standard. I didn't hear a definition of that standard. We challenged them in our brief. We said, you misinterpreted those words. I didn't hear anything from the ITC in their briefs or here today as to what the actual interpretation of those words are. The standard that they use is I know it when I see it and every case seems to come out differently. Our case is very clearly with respect to the patented technology because none of those are made but for the patented technology. Thank you, Your Honors. Okay. Thank you. Thank you all. The case is taken into submission.